UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------X

IISHA T. JACOB,

                              Plaintiff,

                     v.

NYSARC, INC., NEW YORK CITY
CHAPTER,

                           Defendant.

---------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #: _____**
**DATE FILED: December 1, 2014**

13 Civ. 1677 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

On March 11, 2013, Plaintiff Iisha T. Jacob ("Jacob" or "Plaintiff"),

proceeding *pro se* and *in forma pauperis*, filed this action under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), and,

construing Plaintiff's *pro se* claims liberally, under New York Labor Law Section

215, against NYSARC, Inc., New York City Chapter ("AHRC NYC" or

"Defendant").[1]  Construing her claims in the strongest manner possible,

Plaintiff alleges employment discrimination and retaliation based on her

national origin, which is American.  Defendant responds that any actions it

took against Plaintiff during her tenure with it were warranted by her conduct,

and were the product of neither discriminatory nor retaliatory motive.

Defendant has moved for summary judgment on all of Plaintiff's claims.  For

---

[1]      The named Defendant in this case, "AHRC New York City," is more properly known as
the New York City Chapter of NYSARC, Inc.  (*See* Dkt. #9-12).  The Clerk of Court is
directed to amend the official caption as set forth above.

the reasons set forth in the remainder of this Opinion, Defendant's motion is granted in its entirety.

## BACKGROUND[2]

### A.  Factual Background

#### 1.  Plaintiff's Employment with AHRC NYC

On or about December 21, 2011, Plaintiff began her employment with Defendant AHRC NYC.  (Def. 56.1 ¶ 6).  Defendant is a not-for-profit human

---

[2]  The facts set forth herein are drawn from Defendant's Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Def. 56.1"); the Affidavit of Tracy-Ann Adams ("Adams Aff."); Plaintiff's Amended Complaint (Dkt. #4; "Am. Compl."); and the deposition of Plaintiff ("Jacob Dep.").  Citations to Defendant's Rule 56.1 Statement incorporate by reference the documents cited therein.  For convenience, the parties' memoranda of law will be referred to as follows: Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment as "Def. Br."; Plaintiff's Affirmation in Opposition as "Pl. Opp." (citations to this submission are made using the pagination imposed by the Court's electronic case filing ("ECF") system); and Defendant's Reply as "Def. Reply."

Local Rule 56.1 requires a party moving for summary judgment to submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Rule 56.1(a).  The movant's asserted facts are deemed to be admitted unless specifically controverted by the statement served by the opposing party.  Local Rule 56.1(c).  *Pro se* litigants are "not excused from meeting the requirements of Local Rule 56.1."  *Wali* v. *One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009).  However, even where there is incomplete compliance with the Local Rules, the Court retains discretion "to consider the substance of the plaintiff's arguments."  *Id.* (citing *Holtz* v. *Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." (internal quotation marks omitted))); *see also Hayes* v. *County of Sullivan*, 853 F. Supp. 2d 400, 406 n.1 (S.D.N.Y. 2012) ("In light of Plaintiff's *pro se* status, the Court overlooks his failure to file a Local Rule 56.1 Statement and conducts its own independent review of the record.").

Defendants filed a Rule 56.1 Statement on March 17, 2014.  (Dkt. #27).  Plaintiff filed only an Affirmation in Opposition to Motion in response and filed no Rule 56.1 Statement.  (Dkt. #31).  Nonetheless, the Court has conducted an independent review of the record before it in consideration of the substance of Plaintiff's arguments.  Where appropriate, the Court has relied on the undisputed facts in Defendant's Rule 56.1 Statement; however, direct citations to the record have also been used where relevant facts were not included, or where the Court liberally construes Plaintiff's *pro se* submissions or the record evidence to refute a particular fact.

service organization that annually serves more than 11,000 individuals with intellectual and developmental disabilities by providing a wide range of educational, residential, clinical, medical, and recreational services. (*Id.* at ¶ 1). Plaintiff was hired as a Direct Support Professional ("DSP") in Defendant's Home Care Department on a per diem basis. (*Id.* at ¶ 6). Plaintiff's per diem status meant she was not a regular, full-time employee, but instead would receive work assignments based on availability and changing needs of AHRC NYC-affiliated residences throughout New York City. (*Id.* at ¶¶ 7-9).[3] Either Defendant would reach out to Plaintiff to notify her of available shifts, or Plaintiff could call to inquire about available shifts. (*Id.* at ¶ 8). As a DSP, Plaintiff's responsibilities included assisting the individuals in her assigned facility with daily living, skills training, socialization, and recreational activities. (*Id.* at ¶ 12).

Given the vulnerability of many of the individuals it serves, Defendant has developed a series of policies and procedures that focus on the well-being of those individuals. (Def. 56.1 ¶¶ 10-18). These materials are provided to new hires and set expectations for DSPs like Plaintiff, who are required to "work with individuals in accordance with their individualized plan of care, in carrying out professionally developed activities, experiences or therapies in order to fulfill each individual's optimal ability." (*Id.* at ¶¶ 10, 13). Also according to these policies and procedures, DSPs must act as advocates for the

---

[3]     The Director of Defendant's Home Care Department confirmed the irregularity of Plaintiff's per diem schedule in her December 21, 2011 offer letter, which noted, "Your schedule may vary from week to week." (Def. 56.1 ¶ 9; Adams Aff. Ex. B).

individuals, must notify Defendant if they suspect the workplace may endanger the health or safety of an individual, and must not leave before the end of a work schedule. (*Id.* at ¶¶ 14, 16-17). Moreover, these materials identify "[e]ndangering the welfare of the individual by acting in an abusive or neglectful manner" as grounds for immediate termination. (*Id.* at ¶ 18). Plaintiff was provided with these materials upon commencement of her employment with Defendant. (*Id.* at ¶ 10).

### 2. Plaintiff's First Disciplinary Incident

During Plaintiff's 14 months of per diem employment with Defendant, she was the subject of multiple complaints from AHRC NYC-affiliated residences about her work performance, including three complaints that led to disciplinary action. (*See* Def. 56.1 ¶¶ 19-36). The first time Plaintiff was subject to disciplinary action arose out of an incident on February 20, 2012, only a few months into her employ. (*Id.* at ¶ 20). An affiliated residence, the Kraus facility, submitted a complaint regarding Plaintiff's performance during her assigned overnight shift, as well as a request that she not be reassigned to the facility. (*Id.*). Specifically, the facility reported that they could not find Plaintiff in the residence for a period of time, and that when they did find her, she was located near the rear exit with the lights out, clutching her coat and bag. (*Id.*). The facility also reported that Plaintiff had been assigned to shower one individual during her shift, but apparently did not do so because a member of the staff discovered that individual unwashed and soiled with feces. (*Id.*).

4

Additionally, Plaintiff had failed to follow AHRC NYC procedure, which required her to complete a form confirming her orientation at that facility.  (*Id.*).

Plaintiff adds some additional context to this incident.  She claims that upon her arrival at the facility — where the regular staff, her coworkers, were of "different nationalities" — she went to ask the staff if they needed assistance with anything, such as cleaning duties.  (Jacob Dep. 146).  One of the three staff working that night declined her help, and apparently told her to "go downstairs and rest."  (*Id.*).  Plaintiff says that rather than do that, which she believed would get her in trouble, she "kept going around checking up on the individuals, keeping myself busy."  (*Id.*).  Plaintiff does not dispute that she did not shower the individual she was assigned to shower, that she was found with her personal belongings near the exit, or that she failed to fill out the requisite paperwork for the facility.  (*Id.*).

Kent Willingham, who is the Assistant Director of Defendant's Home Care Department and is of the same national origin as Plaintiff, met with Plaintiff the next day to discuss the Kraus facility complaint.  (Def. 56.1 ¶¶ 21-22).  At that meeting, Willingham warned Plaintiff that future performance issues could result in further disciplinary action, including termination.  (*Id.* at ¶ 21).

### 3.    Plaintiff's EEOC Complaint

On or about December 13, 2012, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission (the "EEOC").  (Def. 56.1 ¶ 47).  Defendant received a notice as a result of this charge indicating that the only alleged discrimination was "retaliation" in

violation of Title VII; that the issues involved "assignment, terms/conditions, wages"; and that the latest act of discrimination occurred on November 12, 2012.  (*Id.* at ¶ 49).  Defendant was provided with no other information concerning the bases for Plaintiff's claims.[4]  On February 1, 2013, Defendant received a copy of the Dismissal and Notice of Rights form (containing Plaintiff's Right to Sue Notice) sent to Plaintiff by the EEOC one week earlier; the form indicated that, "[b]ased upon its investigation the EEOC is unable to conclude that the information obtained establishes violations of the statutes." (*Id.* at ¶ 52).

### 4.    Plaintiff's Second Disciplinary Incident

On January 7, 2013, Plaintiff's second incident resulting in disciplinary action occurred at another AHRC NYC-affiliated residence, Bloomberg 3C. (Def. 56.1 ¶ 23).  That day, Plaintiff was 30 minutes late for her assigned shift and failed to follow Defendant's lateness protocol (which required her to advise that she would be late); once at her shift, Plaintiff used the facility's speakerphone in an inappropriate manner, and deliberately ignored her supervisor's requests regarding her use of the telephone.  (*Id.* at ¶ 24).[5]  The supervisor requested that Plaintiff clock out and leave given her inappropriate

---

[4]    In its submissions, Defendant recites its commitment to non-discrimination and equal opportunity for all employees and qualified applicants, a commitment that is embodied in policies that are provided to employees.  (Def. 56.1 ¶¶ 2-3).  These policies contain an established complaint procedure for reporting discriminatory or harassing conduct, of which Plaintiff apparently never availed herself.  (*Id.* at ¶¶ 5, 50).

[5]    Plaintiff makes only a blanket assertion that this incident and her subsequent discipline "never happened" (Pl. Opp. 7), which is insufficient to create a material fact issue on summary judgment, *see Hicks* v. *Baines,* 593 F.3d 159, 166 (2d Cir. 2010) (holding conclusory denials insufficient).

conduct, and also put in a request that Plaintiff not be reassigned to that facility. (*Id.* at ¶ 25). On or about January 16, 2013, Defendant provided Plaintiff with a second warning as a result of this incident. (*Id.* at ¶ 23).[6]

### 5. Plaintiff's NYDOL Complaint

On or about January 28, 2013, Defendant received notice of a complaint Plaintiff had filed with the New York Department of Labor (the "NYDOL"). (Def. 56.1 ¶ 54). In that complaint, Plaintiff contended that Defendant failed to pay her wages for certain hours worked in October and November of 2012. (*Id.* at ¶¶ 53, 55). Although Defendant believed that it had paid Plaintiff for all reported hours, because the complained-of time period had seen Defendant's business operations interrupted by Hurricane Sandy, the possibility existed that the disruption had affected the accurate reporting of Plaintiff's hours to headquarters. (*Id.* at ¶ 56). Given this possibility, on February 8, 2013, Defendant paid Plaintiff $257.73, less required withholdings, which was the amount claimed in her NYDOL complaint. (*Id.* at ¶ 57).

### 6. Plaintiff's Third Disciplinary Incident

On February 15, 2013, Plaintiff's third incident meriting disciplinary action occurred at the AHRC NYC-affiliated residence named Manhattan IRA. (Def. 56.1 ¶ 28). That day, Plaintiff clocked out the minute her shift ended at 11:00 p.m., leaving the facility seven minutes before her replacement arrived, despite being aware that such conduct constituted job abandonment under AHRC NYC's policies. (*Id.* at ¶¶ 29-35). Plaintiff did not verify that the

---

[6]     Defendant does not specify who provided this feedback.

appropriate number of staff were present at the residence, as she was supposed to do. (*Id.* at ¶ 36). On or about February 16, 2013, the manager of the Manhattan IRA submitted a "Significant Event Report" to Defendant describing Plaintiff's misconduct and requesting that Plaintiff not be reassigned to that facility. (*Id.* at ¶¶ 28, 37).

Upon receipt of the report, Willingham placed Plaintiff on inactive status pending investigation of the incident; this meant that Defendant would not assign Plaintiff to shifts in any other facilities during the investigation. (Def. 56.1 ¶ 38). Once Willingham conducted an investigation and confirmed that Plaintiff had indeed left before her replacements arrived, Willingham recommended that Defendant terminate Plaintiff's employment. (*Id.* at ¶ 39). Willingham discussed this recommendation with Tracy-Ann Adams, who is the Director of both Defendant's Home Care and Human Resources Departments, and who is also of the same national origin as Plaintiff. (*Id.* at ¶¶ 40, 44). They determined that Plaintiff's offense was very serious — not only had she abandoned her job in violation of AHRC NYC's policies and procedures, but also, critically, she had left the Manhattan IRA without proper staff coverage, jeopardizing the safety and welfare of the residents. (*Id.* at ¶ 41). They agreed that, given the seriousness of Plaintiff's offense and her prior disciplinary history, termination was appropriate. (*Id.*). Moreover, they noted, this was the fifth facility that had requested Plaintiff not be reassigned to shifts at that

facility.  (*Id.* at ¶ 42).[7]  Defendant terminated Plaintiff's employment effective March 6, 2013.  (*Id.* at ¶ 43).

### 7.  Plaintiff's Lawsuit and Claims of Discrimination and Retaliation

In her Amended Complaint, Plaintiff alleges that Defendant discriminated against her because of her national origin of "being born and raised from America and not from a foreign country," and that the organization retaliated against her for filing her EEOC and NYDOL complaints.  (Am. Compl. 3). Plaintiff has identified as the bases of her claims that Defendant: (i) "turn[ed] [her] down from work when work was available"; (ii) "fail[ed] to inform [her] about termination, investigation, and job abandonment allegations when [she] was calling for work"; (iii) terminated her employment; and (iv) used her social security number "to punch [her] in for days [she] ha[d] not worked."  (*Id.*).

Because, as discussed in note 2, *supra*, the Court has conducted an independent examination of the record before it in consideration of this *pro se* plaintiff's arguments, it turns to Plaintiff's deposition in search of further factual support for her claims.  In her deposition, when asked to explain the bases of her claims, she offered the following as examples of discrimination based on her and her coworkers' respective national origins:

· Plaintiff recalled, "I would hear a lot of Caribbean staff would say, well, we are Caribbean and we are not

---

[7]   This paragraph in Defendant's Statement of Undisputed Facts states that Manhattan IRA was the "fourth" facility that had requested Plaintiff not be reassigned, although it is clear from the recitation of the facts that it was in fact the fifth.  In addition to the Kraus, Bloomberg 3C, and Manhattan IRA facilities, at least two other facilities had requested that Plaintiff not be assigned because she did not possess the requisite skills to support the types of individuals housed at these residences.  (Def. 56.1 ¶¶ 26-27).

American.  That's what I would hear them say." (Jacob Dep. 85).

·   Plaintiff said she felt "discriminated [against] at the residences due to me being American and not of any other nationality … [because] one of the staff is Jamaican…. Another staff was Trinidadian." (*Id.* at 92).  She noted that at certain residences, as far as she knew, all the other staff were non-American.  (*Id.* at 93).

·   Plaintiff felt discriminated against when non-American staff members would say things like, "'Oh, we don't listen to American music, we only listen to Trinidadian music. I go out to Trinidadian parties, I don't go to American parties or listen to American music'" (*id.* at 92-93), and that "they only like men of their national origin" (*id.* at 96).

·   Plaintiff disliked "[h]ow [non-American staff members] would speak to me.  Instead of them asking me to do something, like they would tell me like 'Go upstairs and go fix the beds.'  And I would say, 'Well, you don't have to speak to me like that.'" (*Id.* at 96).  She admitted that she did not know whether they spoke to her this way because she was American, but related that that was "just how [she] would feel." (*Id.*).

Plaintiff does not provide evidence in support of these incidents other than her own testimony; Defendant does not refute that these incidents happened.  The Court therefore accepts the facts of these incidents as undisputed.

In addition, to substantiate her claim that she was "punched in" for days she did not work, Plaintiff testified that on January 9, 2013, Defendant had assigned her to provide coverage at a hospital for one of its individuals.  (Jacob Dep. 186).  Once she arrived, however, that particular individual had been discharged, so she did not end up working that day.  (*Id.*).  Plaintiff contends that one of the coordinators must have signed her in, and that Defendant used

her social security number in order to pay her for that day she did not actually work. (*Id.* at 186-87). This, she says, resulted in her having to reimburse one day of the unemployment benefits that she had claimed. (*Id.*). Plaintiff claimed this was discriminatory because she was getting turned away from work, and her coordinators were different nationalities from her. (*Id.* at 191). Defendant does not contest the facts of Plaintiff's version of this story (although it does contest that this action was discriminatory); the Court therefore accepts these facts as undisputed.

## B.    Procedural Background

After receiving the EEOC's Right to Sue Notice, Plaintiff commenced this lawsuit in federal court on March 11, 2013, and subsequently amended her complaint on March 19, 2013. (Dkt. #1, 4). Defendant answered on June 21, 2013, and submitted an amended answer on September 24, 2013. (Dkt. #10, 20). Following discovery, Defendant moved for summary judgment on March 17, 2014, and the motion was fully briefed on May 12, 2014. (Dkt. #26-29, 31, 32).

## DISCUSSION

## A.    Applicable Law

### 1.    Summary Judgment

#### a.    Generally

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings.  *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to

the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).  Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)); *see also Vargas* v. *Transeau*, 514 F. Supp. 2d 439, 442 (S.D.N.Y. 2007) (observing that "the mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to defeat summary judgment (internal quotation marks and citations omitted)), *aff'd sub nom. Vargas* v. *Pfizer, Inc.*, 352 F. App'x 458 (2d Cir. 2009) (summary order).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  However, in considering "what may reasonably inferred" from witness testimony, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005)

(citing *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).

### b. Summary Judgment in Employment Discrimination Cases

Courts should exercise caution in granting summary judgment in employment discrimination cases where the employer's intent is at issue. *Holcomb* v. *Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). However, "'summary judgment is appropriate even in discrimination cases, for the salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to other areas of litigation.'" *Hongyan Lu* v. *Chase Inv. Serv. Corp.*, 412 F. App'x 413, 415 (2d Cir. 2011) (summary order) (quoting *Weinstock* v. *Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), *superseded by statute on other grounds as stated in Ochei* v. *Coler/Goldwater Mem'l Hosp.*, 450 F. Supp. 2d 275, 282 (S.D.N.Y. 2006)). Indeed, "it is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Feingold* v. *New York*, 366 F.3d 138, 149 (2d Cir. 2004) (internal citation and quotation marks omitted). Furthermore, "[e]ven in the discrimination context, [] a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*, 521 F.3d at 137. A "nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys* v. *City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal citation and quotation marks omitted).

In discrimination cases, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial.  There must either be a lack of evidence in support of the plaintiff's position, or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer* v. *Norden Sys.*, 151 F.3d 50, 54 (2d Cir. 1998) (citations and footnote omitted).  "'Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer.'" *Risco* v. *McHugh*, 868 F. Supp. 2d 75, 98 (S.D.N.Y. 2012) (quoting *Walder* v. *White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 493 (S.D.N.Y. 2010)); *see also Stern* v. *Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997) (same).

### c.    Summary Judgment in *Pro Se* Cases

When considering a motion for summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson* v. *Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010) (citing *LaSalle Bank Nat'l Ass'n* v. *Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005)).  In a *pro se* case, the Court must go one step further and liberally construe the party's pleadings "to raise the strongest arguments that they suggest." *McPherson* v. *Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos* v. *Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

15

Nonetheless, a *pro se* litigant must still be held to the normal requirements of summary judgment, and "bald assertion[s], [] unsupported by evidence," will not overcome a motion for summary judgment. *Carey* v. *Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Stinson* v. *Sheriff's Department*, 499 F. Supp. 259, 262 (S.D.N.Y. 1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended"). Litigants "should be on notice from the very publication of Rule 56(e) that a party faced with a summary judgment motion may not rest upon the mere allegations or denials of the party's pleading and that if the party does not respond properly, summary judgment, if appropriate, shall be entered against him." *Champion* v. *Artuz*, 76 F.3d 483, 485 (2d Cir. 1996) (quoting *Graham* v. *Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988) (internal quotation marks omitted)).

### 2.     The Analysis of Title VII Claims

Title VII discrimination and retaliation claims are properly analyzed under the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, a plaintiff alleging discrimination under Title VII must first demonstrate a *prima facie* case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. The Second Circuit has explained that a plaintiff's burden at this stage is minimal. *Abdu-Brisson* v. *Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001). Nonetheless, in order to state a *prima facie* case for discrimination, "a plaintiff must proffer some admissible evidence of

16

circumstances that would be sufficient to permit an inference of discriminatory motive," *Bennett* v. *Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001), *aff'd*, 51 F. App'x 55 (2d Cir. 2002) (summary order), and "cannot meet [its] burden through reliance on unsupported assertions," *Goenaga* v. *March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Griffin* v. *Ambika Corp.*, 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000) (citation omitted).  A plaintiff's self-serving statement, without direct or circumstantial evidence to support the charge, is also insufficient.  *Fincher* v. *Depository Trust & Clearing Corp.*, No. 06 Civ. 9959 (WHP), 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008) (citing *Gonzalez* v. *Beth Israel Med. Ctr.*, 262 F. Supp. 2d 342, 353 (S.D.N.Y. 2003)), *aff'd*, 604 F.3d 712 (2d Cir. 2010).

If a plaintiff successfully presents a *prima facie* case of discrimination, the defendant must then rebut the presumption by offering legitimate and non-discriminatory reasons for the adverse employment action demonstrated in plaintiff's *prima facie* case.  *Abdu-Brisson*, 239 F.3d at 468-69.  The defendant's burden at this step in the analysis is also "light."  *Greenway* v. *Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998).  "The employer need not persuade the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior."  *Id.*

Under the third step of the *McDonnell Douglas* framework, the burden then shifts back to the plaintiff to prove intentional discrimination by a

preponderance of the evidence.  *Fields* v. *N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 121 (2d Cir. 1997).  The Second Circuit has explained that "there are two distinct ways for a plaintiff to prevail — 'either by proving that a discriminatory motive, more likely than not, motivated the defendants or by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions.'"  *Gordon* v. *N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (quoting *Fields*, 115 F.3d at 121).

**B.    Analysis**

**1.    Plaintiff Does Not Set Forth a *Prima Facie* Case of Discrimination on the Basis of National Origin**

Title VII prohibits employment-related discrimination on the basis of race, color, religion, sex or national origin.  42 U.S.C.A. § 2000e-2(a).  In order to state a *prima facie* case of discrimination, Plaintiff must show that: (i) she is a member of a protected class; (ii) she was qualified for the position in question; (iii) she suffered an adverse employment action; and (iv) the adverse action took place under circumstances giving rise to an inference of discrimination.  *See*, *e.g.*, *Reynolds* v. *Barrett*, 685 F.3d 193, 202 (2d Cir. 2012); *Ruiz* v. *County of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010).  A plaintiff may raise an inference of discrimination for the purposes of making out a *prima facie* case by relying on the theory of disparate treatment; that is, by showing that her employer treated her less favorably than a similarly situated employee outside her protected group.  *Mandell* v. *County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003).  Significantly, and as the Supreme Court has

18

recognized, "Title VII … does not set forth a general civility code for the American workplace." *Burlington Northern and Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 68 (2006) (internal citation and quotation marks omitted).

Defendant does not dispute that Plaintiff is a member of a protected class as an individual of American national origin, nor does it dispute that Plaintiff suffered an adverse action when it terminated her employment.  Rather, Defendant argues that Plaintiff cannot establish that she was qualified for her position or that her termination occurred under circumstances giving rise to an inference of discrimination based on her American national origin.  (Def. Br. 13).  These arguments are analyzed below.

### a.    Plaintiff Was Not Qualified for Her Position

The Court finds that the incidents making up Plaintiff's disciplinary history, in addition to the requests from multiple facilities that she not be assigned to their location due to her lack of professionalism or skills, demonstrate that Plaintiff was unqualified for her position.  Indeed, Plaintiff does not put forth any affirmative evidence that she was qualified for her position.  Rather, Plaintiff denies certain aspects of the three disciplinary incidents in which she was involved; the Court construes these denials as Plaintiff's assertion that she was, in fact, qualified for her position.  The Court has searched the record in consideration of the substance of Plaintiff's arguments; the record reveals scant, if any, support for Plaintiff's viewpoint.

With regards to the first incident, Plaintiff does not contest the underlying conduct for which she was disciplined — she does not dispute that

19

she did not shower the individual she was assigned to shower, that she was found with her things near the exit, or that she failed to fill out the requisite paperwork for the facility.  (*See* Jacob Dep. 146).  The only fact Plaintiff refutes is that she left an individual "in feces," stating that "was a lie" and that she "never left the individuals in feces."  (*Id.*).  Not only does a dispute as to this particular detail fail to raise an issue of material fact (or undermine the basis for her discipline), but also it fails to bolster any argument that Plaintiff was qualified for her position.

As to the second incident, in which Plaintiff arrived 30 minutes late and used a speakerphone inappropriately, Plaintiff simply summarily denies that it ever happened.  (*See, e.g.*, Pl. Opp. 7 (noting on a document titled "Employee Notes" next to a summary of the January 2013 disciplinary incident and her discipline for it, "never happened")).  As Defendant points out, it is unclear whether Plaintiff means to contend that the January 7, 2013 incident itself never took place, or that the January 16, 2013 meeting discussing her misconduct never took place.  (Def. Reply 3 n.3).  In any event, Plaintiff's unsupported contention, "never happened," is in direct contradiction to records confirming that (i) on January 7, 2013, her shift was scheduled to start at 4:00 p.m., but she did not clock in until 4:30 p.m., and (ii) the January 16 meeting did take place.  (Adams Aff. Ex. E, F).  Plaintiff does not meaningfully contest the accuracy of these records or provide anything more than her conclusory denial in support of her argument.  While the Court must draw all reasonable inferences in the Plaintiff's favor, it need not draw unreasonable inferences at

war with undisputed record evidence.  *See Berk*, 380 F. Supp. 2d at 342.  And, such a conclusory assertion, "devoid of any specifics," is insufficient to defeat Defendant's properly supported motion for summary judgment.  *Griffin*, 103 F. Supp. 2d at 308.

Concerning the third disciplinary incident, in which Plaintiff left a residence before her coverage arrived, again Plaintiff denies that this ever happened.  In her deposition, she intimated that she had abided by the rules (*see* Jacob Dep. 137 ("Everyone came in at 11:00.  The shift was over."); *id.* at 138 ("[W]hen I left, all the staff was — whatever staff was there, was there.")), but ultimately admitted that she did not know for a fact whether everyone who was supposed to be working the 11:00 p.m. shift was present (*id.*).  Plaintiff's equivocal, conclusory statements are unsupported by any other record evidence, and, more importantly, are insufficient to create an issue of fact or support her qualification for her position.  (*See id.* at 133-43).

On the other hand, a review of the record reveals abundant support for Defendant's argument that Plaintiff was not properly qualified for her position as a per diem DSP.  During her 14 months of employment, Plaintiff received two disciplinary counseling meetings for two separate incidents.  Multiple residences requested that she not be assigned to their facility, either due to her unsatisfactory work performance or because she did not possess the skills needed to support the individuals residing in those facilities.  And, on February 15, 2013, when Plaintiff left a residence prior to her replacement's arrival thereby jeopardizing the welfare of the individuals housed there, she

21

demonstrated that she did not possess the requisite sense of responsibility for the vulnerable population in her charge.  On this basis alone, Plaintiff has failed to state a *prima facie* case of discrimination, and Defendant is entitled to summary judgment on her discrimination claim.

>    **b.    Plaintiff Cannot Demonstrate That Any Adverse Action Occurred Under Circumstances Giving Rise to an Inference of Discrimination**

The Court finds that Plaintiff's conclusory allegations of discrimination, and complaints about her co-workers' allegedly anti-American sentiments, are insufficient to give rise to any inference of discrimination.  In support of her discrimination arguments, Plaintiff only makes sweeping, conclusory statements that Defendant denied her available work, paid her for an unworked day, failed to advise her of the ongoing investigation for job abandonment, and terminated her because she was American.  (*See*, *e.g.*, Jacob Dep. 180 ("Q: Why do you think these actions were discriminatory?  A: Because I am American and not from a foreign country."); Pl. Opp. 2 ("The motion should be denied because I was discriminated against my national origin American.  I was terminated wrongfully in March when my last day of work was Feb. 15.")).

Plaintiff does not point to any direct or circumstantial evidence that could give rise to an inference of discrimination; instead, she points to adverse employment actions and then claims they were discriminatory.  She does not identify any similarly situated individual of non-American origin (that is,

anyone outside her protected class) who was treated more favorably.[8]  Nor does

Plaintiff point to any derogatory remarks that could give rise to an inference of

national origin discrimination.  The only remarks she references involve the

social companionship and musical preferences of her colleagues of non-

American origin.  (*See*, *e.g.*, Jacob Dep. 93 (complaining that her coworkers

would say, "I go out to Trinidadian parties, I don't go to American parties or

listen to American music[.]")).  Feeling socially or culturally excluded by peers

in the workplace, while an unfortunate and sympathetic position, is not

something for which Title VII provides a remedy.  *See Burlington Northern*, 548

U.S. at 68 (cautioning that anti-discrimination laws do not create a "general

civility code" for the American workplace).  "Furthermore, even assuming

*arguendo*, that there was a genuine issue regarding the existence of

discriminatory intent based on the comments of Plaintiff's supervisor and

coworkers, there is absolutely no evidence of any connection between these

comments and any adverse employment action."  *O'Kane* v. *Lew*, No. 10 Civ.

5325 (PKC), 2013 WL 6096775, at *9 (E.D.N.Y. Nov. 20, 2013) (finding that,

where plaintiff provided ambiguous, anecdotal examples of workplace

interactions that made him "feel left out," as hurtful as plaintiff may have

found certain comments or actions, his subjective perceptions of them alone

were insufficient to establish discriminatory motive); *see also Tomassi* v.

*Insignia Fin. Grp, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) ("[T]he more remote

---

[8]     By contrast, Defendant supplies evidence that it has recently terminated DSPs of both
        non-American and American origin for the very same reason, job abandonment, as
        Plaintiff.  (Def. 56.1 ¶¶ 45-46).

and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination."); *Johnson* v. *County of Nassau*, 480 F. Supp. 2d 581, 599-600 (E.D.N.Y. 2007) (finding that a comment by plaintiff's supervisor was a "stray remark" that was "insufficient to raise an inference of discrimination because there [was] no nexus between his remark and any of the alleged adverse acts").

In support of her related argument that it was discriminatory that she was "punched in" for days she did not work, Plaintiff testified that once she arrived for her shift, it turned out that the individual assigned to her care had already been discharged, and so she did not work that day.  (Jacob Dep. 186). By Plaintiff's own description of the facts, she was turned away from work that day because of a lack of need, and not for any discriminatory reason.  As it happened, because the schedule had changed at the last minute, Defendant paid Plaintiff (perhaps mistakenly) for that day anyway.  This was clearly not an attempt to adversely affect Plaintiff's entitlement to unemployment benefits. The effect — Plaintiff having to reimburse unemployment benefits for that day — was not adverse at all.  Plaintiff was not entitled to a windfall of both regular pay and unemployment benefits for a day on which she was paid as if she had actually worked.

Indeed, Plaintiff's own testimony underscores the Court's conclusion that reasons underlying any adverse or allegedly adverse employment actions were not discriminatory.  (*See*, *e.g.*, Jacob Dep. 97 (admitting that no one at Defendant ever told Plaintiff that they did not like her because she was

American); 183-84 (admitting that she was unable to provide any comparators who were treated differently); 202 (admitting that no one at Defendant ever told Plaintiff that she was not assigned shifts because of her national origin as an American, or because she had filed an EEOC charge or NYDOL complaint); 257 (admitting that no one at Defendant ever made a remark that Plaintiff was being treated differently or terminated because she was American)).  Finally, both Willingham and Adams, the Defendant's managerial employees who were responsible for making the decision to terminate Plaintiff, were of the same national origin as Plaintiff, defeating any inference of discrimination on that ground.

In short, Plaintiff "has identified no evidence, whether direct or circumstantial, that would permit a reasonable fact-finder to draw an inference that [the alleged adverse employment actions were] the result of unlawful discrimination against [her]."  *Wali*, 678 F. Supp. 2d at 182 (internal citation omitted).  On this basis, too, Plaintiff has failed to state a *prima facie* case of discrimination, and Defendant is entitled to summary judgment on her discrimination claim.

### c. Plaintiff Cannot Identify a Genuine Issue of Fact Concerning Defendant's Non-Discriminatory Reasons for Terminating Her Employment

Even if Plaintiff had established a *prima facie* case of discrimination, which she has not, Defendant has clearly established a non-discriminatory justification for the adverse employment actions of which she complains.  First, regarding the denial of shifts, it is undisputed that Plaintiff was not a full-time

employee, but rather was hired on a per diem, as needed basis.  Additionally, as discussed above, AHRC NYC has submitted substantial, unrefuted evidence showing that Plaintiff's non-assignment of work and ultimate termination were a result of her unsatisfactory work performance and lack of requisite skills. *See Auguste* v. *N.Y. Presbyterian Med. Ctr.*, 593 F. Supp. 2d 659, 666 (S.D.N.Y. 2009) (holding poor work performance is well-established as legitimate, non-discriminatory reason for firing employee).  Plaintiff's quibbles with certain of facts underlying these reasons do not undermine their legitimacy.  *See McPherson* v. *N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case, however, we are decidedly not interested in the truth of the allegations against plaintiff.  We are interested in what motivated the employer." (internal citation and quotation marks omitted)).

Moreover, neither Plaintiff nor the record provides any evidence of pretext, or any evidence that other, similarly situated employees not in Plaintiff's protected class were treated differently despite similar work performance issues.  Thus, taking Plaintiff's claims through the entirety of the *McDonnell Douglas* framework further confirms that they must fail as a matter of law.

### 2. Plaintiff Does Not Set Forth a *Prima Facie* Case of Retaliation

#### a. Plaintiff Fails to Establish That Defendant Retaliated Against Her for Filing the EEOC Charge

Title VII also makes it unlawful for an employer to discriminate against an employee by retaliating against her because she has "opposed" a practice that Title VII forbids.  42 U.S.C. § 2000e-3(a).  To establish a *prima facie* case of

retaliation under Title VII, a plaintiff must demonstrate that (i) she engaged in protected activity; (ii) the employer was aware of that activity; (iii) the employee suffered a materially adverse action; and (iv) there was a causal connection between the protected activity and that adverse action.  *Kelly* v. *Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013).

Defendant does not dispute that Plaintiff filed an EEOC charge in December 2012, that it was aware of this charge around that same time, or that it terminated her employment effective March 6, 2013.  (Def. Br. 18).  However, Defendant contests that Plaintiff has established any causal connection between her filing of the EEOC Charge and any adverse employment action.  (*Id.*).

In order to establish the causal connection between her filing of the EEOC Charge and an adverse employment action, Plaintiff can either offer direct evidence of retaliatory animus, or offer indirect, circumstantial evidence by demonstrating that the protected activity was followed in close proximity by the adverse treatment.  *Cobb* v. *Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004).  Plaintiff has not presented any evidence of direct retaliatory animus by Defendant.[9]  As it concerns indirect evidence of proximity, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and

---

[9]     To the extent that Plaintiff might argue that the statements of her colleagues regarding their non-American social preferences and music tastes constitute direct evidence of retaliatory animus, they do not.  These types of allegations fall within the realm of prototypical workplace incidents that are not actionable under Title VII's anti-retaliation provision.  *See Burlington*, 548 U.S. at 68 ("[P]ersonality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable." (internal citation and quotation marks omitted)).

an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be 'very close,'" *Clark County Sch. Dist.* v. *Breeden*, 532 U.S. 268, 273 (2001) (citation omitted), although there is no bright-line rule on how close is close, *see Gorman-Bakos* v. *Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554-55 & n.5 (2d Cir. 2001) (collecting cases).  However, "where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  *Hartley* v. *Rubio*, 785 F. Supp. 2d 165, 182 (S.D.N.Y. 2011) (citing *Slattery* v. *Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)).

Courts in this Circuit have granted summary judgment for defendants where plaintiff was warned about his or her inadequate work performance prior to engaging in protected activity.  *See Deebs* v. *Alstom Transp., Inc.*, 346 F. App'x 654, 657-58 (2d Cir. 2009) (summary order) (finding where adverse employment actions due to poor performance preceded plaintiff's filing of an EEOC complaint, no causal connection could arise despite temporal proximity); *Slattery*, 248 F.3d at 95 (finding where adverse employment action due to deficient performance commenced five months prior to plaintiff's filing of an EEOC complaint, there could be no causal connection between plaintiff's complaint and his firing); *Dixon* v. *Int'l Fed'n of Accountants*, No. 09 Civ. 2839 (HB), 2010 WL 1424007, at *6 (S.D.N.Y. Apr. 9, 2010) ("[Plaintiff] was subjected to repeated critiques and complaints about her management and performance

skills before she ever lodged any complaints about discrimination and, as such, her retaliation claim must be dismissed."), *aff'd*, 416 F. App'x 107 (2d Cir. 2011) (summary order); *Ricks* v. *Conde Nast Pubs.*, 92 F. Supp. 2d 338, 347-48 (S.D.N.Y. 2000) (granting summary judgment for defendant where plaintiff received two warnings prior to filing her complaint).

Here, Defendant put Plaintiff on notice of deficiencies in her performance some 10 months before she filed the EEOC complaint, at her first disciplinary counseling meeting. Plaintiff was aware that certain AHRC NYC-affiliated residences had specifically requested that she not be reassigned to their facility. Moreover, Plaintiff's EEOC complaint itself alleged adverse employment action in the form of denial of shifts (Def. 56.1 ¶ 49), thereby confirming that this adverse employment action was occurring, if at all, prior to any protected conduct in which she may have engaged. Plaintiff continued to have performance issues following her EEOC complaint; the act of filing an EEOC complaint does not provide an employee immunity from the consequences of poor performance. Finally, Plaintiff herself admitted that no one at Defendant ever told her that she was not assigned shifts because of her national origin as an American, or because she had filed an EEOC charge. (Jacob Dep. 202). Therefore, for those reasons, Plaintiff has failed to state a *prima facie* case of retaliation, and Defendant is entitled to summary judgment on her federal retaliation claim.[10]

---

[10]    Here, too, even if Plaintiff had established a *prima facie* case of retaliation, Defendant's non-discriminatory, non-pretextual reasons for denying her shifts and terminating her ensure that her claims also fail under a full *McDonnell Douglas* analysis. *See Evans* v.

**b.   Plaintiff Fails to Establish that Defendant Retaliated Against Her for Filing the NYDOL Complaint**

Plaintiff also contends that she suffered retaliation for filing her NYDOL Complaint.  While such a claim is not actionable under federal law, the Court liberally construes Plaintiff's *pro se* submissions to plead a violation of New York Labor Law Section 215.  This section states:

> No employer ... shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint ... to the commissioner or his or her authorized representative ... that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter ....

N.Y. Lab. Law § 215(1)(a)(i).  In order to establish a *prima facie* case under this section, Plaintiff "must adequately plead that while employed by the defendant, she made a complaint about the employer's violation of the law and, as a result, was terminated or otherwise penalized, discriminated against, or subjected to an adverse employment action."  *Copantitla* v. *Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 302 (S.D.N.Y. 2011) (citation omitted).  Once a *prima facie* case of retaliation is established under the New York Labor Law, the burden of production shifts back and forth, just as under the federal *McDonnell Douglas* framework.  *Id.* (explaining that after a *prima facie* case is established,

---

*N.Y. Botanical Garden*, 253 F. Supp. 2d 650, 661 (S.D.N.Y. 2003) (granting summary judgment for defendant on retaliation claim where plaintiff failed to raise a material issue of fact with regard to whether defendant's proffered non-discriminatory reason for firing him was pretextual), *aff'd,* 88 F. App'x 464 (2d Cir. 2004) (summary order).

30

the burden shifts to defendant to demonstrate a legitimate, non-discriminatory reason for its action, and then back to plaintiff to establish pretext).

However, Plaintiff again fails to state a *prima facie* case of retaliation. Defendant does not dispute that Plaintiff filed the NYDOL complaint and that it denied her shifts and ultimately terminated her employment, but Plaintiff cannot establish a causal connection between her complaint and these adverse employment actions. Circumstantially, Plaintiff was terminated on March 6, 2013, a little over a month following the January 28, 2013 NYDOL complaint. (Def. 56.1 ¶ 54). However, as discussed above, Plaintiff was facing adverse employment actions for her inadequate work performance well before the NYDOL complaint; indeed, by that time, Plaintiff had received two disciplinary counseling sessions (the second having occurred earlier in January 2013). Thus temporal proximity cannot give rise to an inference of retaliation.

Moreover, other circumstantial evidence suggests that Defendant responded only favorably to Plaintiff's claim for purported unpaid wages — it gave her the benefit of the doubt in light of Hurricane Sandy business disruptions and promptly paid the full amount 10 days after she filed the complaint. In further support of a finding of no retaliation, Plaintiff herself admitted that no one at Defendant ever told her that she was not assigned shifts because she had filed an NYDOL complaint. (Jacob Dep. 202). Plaintiff has therefore failed to state a *prima facie* case of retaliation, and Defendant is

31

entitled to summary judgment on what the Court has construed as a state law retaliation claim.[11]

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED in its entirety.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.  The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal.  *See Coppedge* v. *United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

Dated:      December 1, 2014
            New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge

---

[11]      Additionally, as discussed more fully above, Defendant has established non-discriminatory reasons for adverse employment actions taken against Plaintiff, as to which Plaintiff has failed to raise a genuine issue of material fact.